**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SOME, INC., | |
| Plaintiff, | Civil Action No. 21-00493 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| HANOVER INSURANCE COMPANY, *et al.* | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

In 2015, plaintiff SOME, Inc. (an acronym for "So Others Might Eat") contracted to construct the Conway Center, a facility providing housing and services to low-income and homeless individuals. Pl.'s Statement of Material Facts ¶ 2 ("Pl.'s SMF"), ECF No. 39. To protect the Conway Center, plaintiff obtained two "all risk" insurance policies—the Builders' Risk Policy and the Master Policy—covering the period of October 29, 2015 to January 1, 2019, from defendants The Hanover Insurance Company and The Hanover American Insurance Company (together, "Hanover"), *id.* ¶¶ 4, 7-8, purchased through an insurance broker, defendant Maury, Donnelly & Parr, Inc. ("MDP"), Compl. ¶ 1, ECF No. 1. In 2018, after noticing severe structural damage to the newly built facility, plaintiff notified Hanover of the loss due to necessary repairs at the facility. Pl.'s SMF ¶¶ 16-22. When Hanover denied coverage, *id.* ¶¶ 23-24, plaintiff initiated this action, alleging, in four claims, that Hanover had wrongfully refused to provide coverage for the loss and that MDP negligently misrepresented the coverage procured for plaintiff.

Plaintiff and Hanover have now filed cross-motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56. Pl.'s Mot. Part. Summ. J. at 1 ("Pl.'s Mot."), ECF No. 26;

Defs.' Mot. Summ. J. ("Defs.' Cross-Mot."), ECF No. 29.[1]  Hanover contends that the Policies'

exclusions proscribing coverage for any loss "caused by or resulting from" a design defect, as well

as an exclusion proscribing coverage for any loss from settling, cracking, and collapsing, bars

coverage.  Defs.' Mem. Supp. Mot. Summ. J. at 6 ("Defs.' Mem."), ECF No. 30.  Plaintiff counters

that the design defect exclusions set out in the Policies do not bar coverage because the exceptions

to both exclusions apply, Pl.'s Mot at 1, ECF No. 26, and, further, that the Master Policy Exclusion

concerning settling, cracking and collapsing is inapplicable based on a plain reading of that

exclusion's text.  Pl.'s Opp'n Hanover's Mot. Summ. J. at 22–23 ("Pl.'s Opp'n"), ECF No. 33.

For the reasons explained below, the Policies only cover loss or damage that is otherwise

not excluded, and exclusions in both Policies expressly bar coverage for damage or loss "caused

by or resulting from" a design defect, a coverage limit also incorporated into the exceptions on

which plaintiff relies.  Here, the claimed damage to the Conway Center can only be traced to the

building's defectively designed structural members and not a segregable covered cause of loss.

Accordingly, Hanover's motion for summary judgment is GRANTED, and plaintiff's motion for

partial summary judgment against Hanover is DENIED.

## I.      BACKGROUND

The relevant factual and procedural background is summarized below.

### A.  Factual Background

The material facts are not in dispute.  Plaintiff is an interfaith, community-based non-profit

organization with the mission of helping individuals and families experiencing homelessness and

low-income in the District of Columbia.  Pl.'s SMF ¶ 1.  In 2015, plaintiff broke ground on the

Conway Center, which is designed to be a 320,000-plus square foot, mixed-use facility consisting

---

[1]      Plaintiff moved for summary judgment solely against Hanover and, thus, MDP is not participating in these cross-motions for summary judgment.

of more than 200 units of affordable housing, a job training center, health care facilities and administrative offices. *Id.* ¶ 2.  The Conway Center is located on Benning Road in Northeast D.C. *Id.*

The Conway Center's structural members (or components) were designed to be constructed with a combination of concrete and reinforcing steel.  *Id.* ¶ 3.  This design was supposed to allow the structural members to have the capacity to carry the loads that would be imposed on the structure, such as the weight of the elements of the building itself (dead load) and the weight of the people, materials, and equipment inside (live load).  *Id.* ¶ 19.  Once complete, the Conway Center would include a three-story below-grade parking garage, with seven above-grade floors of finished space.  *Id.* ¶ 3.

### 1. Insurance Policies At Issue

Plaintiff purchased two insurance policies from Hanover to provide coverage for potential damage to the Conway Center.  First, plaintiff purchased a Commercial Inland Marine Policy ("Builders' Risk Policy") that insured the building while construction was underway, from October 29, 2015 to April 30, 2018.  *See* Pl.'s Mot., Ex. A, Builders' Risk Policy No. IHQ A759841 00 ("BRP"), ECF No. 26-1; *see also* Pl.'s SMF ¶ 4; Defs.' Mat. Facts Not in Dispute ¶ 14 ("Defs.' SMF"), ECF No. 30.  Second, on April 29, 2018, SOME added the Conway Center as an insured location under its Master Policy, a commercial policy that include several different types of insurance, including building and personal property coverages.  *See* Pl.'s Mot., Ex. B, Master Policy No. ZZQ D127251 ("MP"), ECF Nos. 26-2, 26-3, 26-4; *see also* Pl.'s SMF ¶¶ 8-10.

The parties dispute whether two exclusions of coverage in the Master Policy and one exclusion of coverage in the Builders' Risk Policy operate to bar or confirm coverage for plaintiff's claimed damage to the Conway Center.  The Builders' Risk Policy provided coverage for "direct

physical loss or damage caused by a covered peril to 'buildings or structures' while in the course of construction, erection or fabrication." BRP at 17.  A covered peril includes all "risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded." *Id*.  At issue here is the following Builders' Risk Policy Exclusion, with the disputed exclusion's exception set out after the "But if" text:

> 2(c).  "We" do not pay for loss or damage caused by or resulting from an act, defect, error, or omission (negligent or not) relating to:
> …
> c. **Defects, Errors, And Omissions** –
> 1) design, specifications, construction, materials, or workmanship;
> …
> But if an act, error, or omission as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

BRP at 29 (hereinafter "BRP Exclusion 2.c.(1)").

The Master Policy has similar text.  Under the Master Policy, Hanover promised to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  MP, ECF No. 26-3 at 29. "Covered Property" is defined to include buildings or structures described in the Declarations, *id.*, which, as of April 29, 2018, included the Conway Center, *id.*, ECF No. 26-4 at 84.  "Covered Cause of Loss" is defined to mean "direct physical loss unless the loss is excluded or limited in this policy."  *Id.*, ECF No. 26-3 at 62.  At issue here is the following Master Policy Exclusion, with the disputed exclusion's exception set out after the "But if" text:

> We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

*Id.*, ECF No. 26-3 at 65.  The reference in both the exclusion and exception to "3.c."—a listed "excluded cause of loss"—reads, in pertinent part, as follows:

(c) Faulty, inadequate or defective:

. . .
(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction[.]

*Id.* (hereinafter "MP Exclusion 3.c.(2)").

The final disputed exclusion is in the Master Policy and provides that Hanover "will not pay for loss or damage caused by or resulting from any of the following: . . . [s]ettling, cracking, shrinking or expansion; . . . [and] [c]ollapse, including any of the following conditions of property or any part of the property: . . . (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to … (2) above." MP, ECF No. 26-3 at 64–65 ("MP Exclusion 2(k)").

In sum, both Policies cover "direct physical loss or damage" when "caused by a covered peril" (under the Builders' Risk Policy) or "caused by or resulting from any Covered Cause of Loss" (under the Master Policy).  Exclusions in both Policies then deny coverage for damages "caused by or resulting from" specified excluded events—as relevant here, defective design.  The 'But if' exceptions then restore or grant coverage when an excluded event "results in" non-excluded physical damage  "caused by that covered peril" (under the Builders' Risk Policy) or "caused by that Covered Cause of Loss" (under the Master Policy).[2] The Policies' coverage and exclusion provisions thus seemingly use the terms "caused by" and "resulting from" as interchangeable and having the same meaning, and use in the exception provisions the slightly different term "results in," thereby setting up plaintiff's interpretative dispute over the scope of the exceptions.

---

[2]     Master Policy Exclusion 2(k)'s exception provides, "But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss."  MP, ECF No. 26-3 at 5.

The relevant definitions of both "covered peril" and "Covered Cause of Loss," under the Builders' Risk Policy and Master Policy, respectively, each contain two limits on coverage: first, limiting coverage to "direct physical loss"—and risks thereof, in the Builders' Risk Policy—which merely reiterates one aspect of the scope of coverage, *see* BRP at 17; MP, ECF No. 26-3 at 62; and, second, limiting coverage to such losses not otherwise "excluded." BRP at 17 (emphasis added) (defining "covered peril" as including "risks of direct physical loss or damage *unless the loss is limited or caused by a peril that is excluded*"); MP, ECF No. 26-3 at 62 (emphasis added) (defining "Covered Cause of Loss" as meaning "direct physical loss *unless the loss is excluded or limited in this policy*").

### 2. Plaintiff's Discovery of Design Defect

In December 2018, Mary Ellen Slattery, who was hired by plaintiff to serve as the Construction Project Manager for the construction of the Conway Center, Pl.'s Mot., Ex. C, Declaration of Mary Ellen Slattery ("Slattery Decl.") ¶ 2, ECF No. 26-5, received an email from Mike Bean, the project manager for the general contractor hired to build the Conway Center, informing Slattery that Bean's team had noticed some cracking at several concrete beams on the first-floor slab. *Id.* ¶ 6. The architectural and structural engineering firms that designed the building were asked to review the conditions at the site. *Id.* ¶ 7. The designers arranged to have temporary shoring installed to prevent the building from collapsing, but the shoring was so extensive as to interfere with plaintiff's use of the parking garage and to restrict the use of the loading dock and above-grade space throughout the building. *Id.* ¶ 9.

Plaintiff hired Allyn Kilsheimer, a licensed structural engineer in the District of Columbia, *see* Pl.'s Mot, Ex. D., Declaration of Allyn E. Kilsheimer ("Kilsheimer Decl.") ¶ 2, ECF No. 26-6, to independently investigate the condition of the structure and the damage. Slattery Decl. ¶¶ 10-

11.    Mr. Kilsheimer identified numerous overstressed and failed structural members, which required additional temporary shoring to ensure against the building's collapse, Kilsheimer Decl ¶ 12, leading to his conclusion that many of the structural members were not adequately designed to carry the dead load to which they were to be subjected, *id.* ¶ 6.  He also found that the failure of certain structural elements began during the initial phases of construction, as early as when the second level of the concrete structure above-grade was completed.  *Id.* ¶ 7 ("[T]he failure began as the second level of the concrete structure above grade was completed. The structure consisted of concrete columns, beams, and slabs with reinforcing steel. The design creating the size, strength, and bond between the concrete and the reinforcing steel combined to develop the load bearing capacity of the member.").  As explained by Mr. Kilsheimer, the "failure mechanism was that, as the loads exceeded the as-designed capacity of the member, the members suffered permanent physical damage as the reinforcing steel de-bonded from the concrete, which resulted in the reinforcing steel becoming overstressed since there was no longer composite action between the concrete and the reinforcing steel."  *Id.*  The overstressed reinforcing steel then "became [so] deformed such that the concrete and reinforcing steel were no longer capable of carrying the superimposed loads without risk of collapse."  *Id.*  The failure of the structural elements in the building occurred before expiration of the Builders' Risk Policy.  Pl.'s SMF ¶ 20.

Hanover's structural engineer, who was hired to inspect the Conway Center and opine on the cause of the damage, reached essentially the same conclusions at plaintiff's structural engineer, Mr. Kilsheimer.  *See* Pl.'s Mot., Ex. E, Envista Forensics Report of Findings ("Envista Report"), ECF No. 26-7.  Specifically, Hanover's engineer's report concluded that the "cracking of the two-way concrete slab, the concrete beams, and the concrete columns within the subgrade parking deck

were the result of systemic design related deficiencies that resulted in structural elements with inadequate capacity to resist building code mandated loading." *Id.* at 4.

### 3. Denial of Coverage Under Insurance Policies

Plaintiff filed claims under both the Builders' Policy and the Master Policy for the damage caused to the Conway Center, which claims Hanover denied. *See* Pl.'s Mot, Ex. F, Hanover Master Policy Denial (April 12, 2019) ("MP Denial Letter"), ECF No. 26-8; Pl.'s Mot, Ex. G, Hanover Builders Risk Denial (October 13, 2021) ("BRP Denial Letter"), ECF No. 26-9.   In denying coverage under the Master Policy, Hanover cited MP Exclusion 3.c.(2) as a basis for denying coverage, while "expressly reserv[ing] any and all rights of either party under the policy, and the law."  MP Denial Letter at 2–3.  In denying coverage under the Builders' Risk Policy, Hanover cited BRP Exclusion 2.c.(1), while likewise "reserv[ing] any and all defenses that may now exist or which may arise in the future or which may be disclosed upon further investigation."  BRP Denial Letter at 2–3.

### B.  Procedural Background

After Hanover denied coverage under both Policies, plaintiff filed this lawsuit, alleging against Hanover, in Count One, that the MP Exclusion did not apply to the Conway Center loss, Compl. ¶¶ 81–85; in Count Two, that Hanover breached its implied covenant of good faith and fair dealing by failing to inform plaintiff that canceling the Builders Risk Policy and adding the Master Policy before construction was complete would materially change plaintiff's coverage, *id.* ¶¶ 87–90; and, in Count Three, "that Hanover is required, under the terms of the Master Policy, to provide coverage of the costs to repair and/or replace the [structural damage] at the Conway Center," pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *id.* ¶ 104.  Finally, in Count Four, plaintiff alleges that MDP was negligent by "misrepresenting the coverage available to [plaintiff] for the Conway Center under the Master Policy, by misrepresenting Hanover's

agreement to coverage under the Master Policy with the same terms as the Builders' Risk Policy, by misrepresenting that the coverage would be the same under the [two] [p]olicies, and/or by failing to advise [plaintiff] of the option to procure additional coverage." *Id.* ¶ 109.[3]  As relief, plaintiff seeks against all defendants "all damages proximately caused by [their] breach in an actual and estimated amount in excess of $30 million, plus costs, interest, disbursements, and attorneys' fees." *Id.* at 19 ("Prayer for Relief").[4]

Plaintiff and Hanover subsequently filed cross-motions for summary judgment.  With briefing now complete, *see* Pl.'s Opp'n; Defs.' Opp'n Pl.'s Mot. Part. Summ. J. ("Defs.' Opp'n"), ECF No. 31; Pl.'s Reply Supp. Mot. Part. Summ. J. ("Pl.'s Reply"), ECF No. 32; Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply"), ECF No. 34, followed by a submission of supplemental authority, *see* Defs.' Notice Supp. Auth., ECF No. 38, the parties' cross-motions are ripe for resolution.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto*

---

[3]     Plaintiff also filed claims against two engineering firms that designed the Conway Center, Defs.' SMF ¶ 8, and it reached settlement with a third peer reviewing engineering firm that was hired to review the design and structure of the building, Defs.' SMF ¶¶ 9-10; *see also* Defs' Mot, Ex. B, Pl.'s Resp. and Objs. to MDP's Interrog. ¶ 8 (Plaintiff acknowledging that it "has made claims against W+A and MCE[,] [the firms that designed the Conway Center,] and filed a lawsuit against BEI Structural Engineers, an engineering firm that performed peer review of the designs of the Conway Center."), ECF No. 30-2; *SOME v. BEI Structural Engineers, Inc.*, No. 19-cv-3627-CRC, ECF No. 30-4 at 1 (D.D.C. Aug. 2, 2022) (parties indicating that they "have reached an agreement in principle to resolve the issues in the present case"); Pl.'s Opp'n at 19 (acknowledging "claims brought by [it] against the design professionals" but arguing that those claims have "no bearing on whether or not there is coverage under the [ ] Policies").

[4]     Soon after the complaint was filed, MDP moved to dismiss Count Four for lack of subject matter jurisdiction, MDP's Mot. Dismiss, ECF No. 15, arguing that plaintiff's claims against MDP were not ripe and only contingent on plaintiff's claims against Hanover, MDP's Mem. Supp. Mot. Dismiss at 1, ECF No. 15-1.  This motion to dismiss was denied, *see* Order Denying MDP's Motion to Dismiss, ECF No. 20; Memorandum Opinion (July 13, 2021) at 9–10, ECF No. 21, and discovery is underway, *see* Scheduling Order (November 4, 2022).

*Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* FED. R. CIV. P. 56(a).  In determining whether a genuine dispute as to any material fact exists, the court must "view[] the evidence in the light most favorable to the non-movant."  *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017) (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)).

When, as here, cross-motions for summary judgment are considered, both parties must be accorded "the solicitude owed non-movants," assessing the evidence in the light most favorable to each.  *Id.*  In conducting this analysis, the record must be "taken as a whole."  *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted) (citing *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.   DISCUSSION

The parties do not contest that the Conway Center is an insured property under the Builders' Risk and Master Policies, that the Conway Center experienced physical loss, *see* Pl.'s Mot. at 15, and that the structural members of the Conway Center were defectively designed to carry the load of the building, *see* Kilsheimer Decl. ¶ 7; Envista Report at 4.  The dispute is about whether the exceptions to the design defect exclusions apply since, if these exceptions do apply, the exclusions do not bar coverage for the loss plaintiff incurred from the defective design of the Conway Building.  *See* Pl.'s Mot. at 15; Defs.' Mem. at 15.

10

The design defect exclusions bar coverage under either Policy because the exceptions to those exclusions do not apply. Consequently, as explained in detail below, the damage to the Conway Center is not covered under either the Builders' Risk Policy or the Master Policy.

### A.    Applicable Insurance Contract Principles

Both parties agree that District of Columbia law on insurance contracts governs this dispute. *See* Pl.'s Mot. at 9; Defs.' Mem. at 13. "Contract principles are applicable to the interpretation of an insurance policy." *Carlyle Inv. Mgmt. L.L.C. v. Ace Am. Ins. Co.*, 131 A.3d 886, 894 (D.C. 2016) ("*Carlyle*"); *accord Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.*, 758 F.3d 378, 383 (D.C. Cir. 2014) ("Because an insurance policy is a contract, we construe it according to contract law principles."). D.C. law requires courts to "adhere[] to an objective law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite meaning." *Aziken v. District of Columbia*, 70 A.3d 213, 218–19 (D.C. 2013) (quotation marks and citation omitted). "'The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract . . . was made.'" *Carlyle*, 131 A.3d at 894 (*quoting Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009)). Similarly, the policy must be "examine[d] . . . on its face, giving the language used its plain meaning, unless, in context, it is evident that the terms used have a technical or specialized meaning." *Interstate Fire*, 758 F.3d at 383.

Ultimately "it is the insurer's duty to spell out in plainest terms—terms understandable to the man in the street—any exclusionary or delimiting policy provisions." *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999) (alteration and quotation marks omitted). Thus, when interpreting an insurance contract, the court must construe "ambiguities . . . against the

insurer and in favor of 'the reasonable expectations of the purchaser of the policy.'" *Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001); *Smalls v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C. 1996).   In other words, if a term "is reasonably open to two constructions, the one most favorable to the insured will be adopted." *Chase*, 780 A.2d at 1127. An insurance contract, however, is not "ambiguous merely because the parties do not agree on the interpretation of the contract provision in question." *Byrd v. Allstate Ins. Co.*, 622 A.2d 691, 693–94 (D.C. 1993).   The D.C. Court of Appeals has explained that "[p]olicy language is not genuinely ambiguous unless it is susceptible of more than one *reasonable* interpretation," instructing courts not to "indulge in forced constructions to create an obligation against the insurer." *Chase*, 780 A.2d at 112–28 (emphasis in original) (citation omitted).

As with other insurance contract terms, "exclusions from coverage are to be strictly construed, and any ambiguity in the exclusion must be construed against the insurer." *Carlyle*, 131 A.3d at 896 (quotation marks omitted).   "Where an insurer attempts to avoid liability under an insurance policy on the ground that the loss for which recovery is sought is covered by some exclusionary clause, the burden is on the insurer to prove the facts which bring the case within the specified exception." *Cameron*, 733 A.2d at 968.

Finally, on issues for which no District of Columbia law is extant, District of Columbia courts "look to the law of Maryland for guidance before it looks to the law of other states." *Conesco Indus., Ltd. v. Conforti & Eisele, Inc., D.C.*, 627 F.2d 312, 315–16 (D.C. Cir. 1980).

### B.      The Policies' Design Defect Exclusions Bar Coverage

Plaintiff acknowledges that "[i]n issuing an 'all risk' policy, an insurance company accepts the risk of a fortuitous loss or damage to insured property unless specifically excluded under the policy."  Pl.'s Mot. at 8.   The parties agree that, here, the Policies' design defect exclusions, standing alone, would bar coverage for the damage to the Conway Center. Defs.' Mem. at 14–15;

*see* Pl.'s Mot. at 15.  Those exclusions, however, have "But if" exceptions and, in these latter provisions, plaintiff seeks to find interpretive relief from the express terms of the exclusions.  No such relief is available.

Hanover sets out a straight-forward interpretation of the Policies' "But if" exceptions, pointing to the definitions of "covered peril" and "Covered Cause of Loss" as constraining the scope of the exceptions and expressly limiting the exceptions to avoid overriding the exclusions.  Defs.' Mem. at 15-16.  Recall that "covered peril" is defined as "risks of direct physical loss or damage *unless the loss is limited or caused by a peril that is excluded*," BRP at 17 (emphasis added), and "Covered Cause of Loss" is defined as "direct physical loss *unless the loss is excluded or limited in this policy*," MP, ECF No. 26-3 at 62 (emphasis added).  These definitions, by their plain terms, cover *only* losses not subject to the exclusions, meaning that, despite qualifying as "direct physical loss or damage," coverage is nonetheless barred when that loss or damage is "caused by or resulting from" a design defect.  MP Exclusion 3.c.(2); BRP Exclusion 2.c.(1).

Indisputably, the structural problems with the Conway Center were solely caused by the defective design without any other segregable cause of loss, and they are thus excluded.  As a consequence, any damages solely due to design defect cannot be a "covered peril" or "Covered Cause of Loss," which is a prerequisite for the exceptions to apply, as the exceptions promise only that Hanover "will pay for the loss or damage caused by that Covered Cause of Loss" (MP, ECF No. 26-3 at 65) or "by that covered peril" (BRP at 29).  No separate non-excluded (or covered) cause of loss that would trigger the "But if" exception is present here.

Plaintiff offers an alternative reading of the exclusions, exceptions, and definitions.  Specifically, plaintiff highlights the difference in the exclusions' use of the term "resulting from" and the exceptions' use of the term "results in" to reason that the exceptions provide coverage if

the design defect "results in a covered peril" (Builders' Risk Policy) or "results in a Covered Cause of Loss" (Master Policy), Pl.'s Mot. at 9–10, regardless of whether the underlying cause of the physical damage is excluded so long as physical damage results.  In this reading, according to plaintiff, "the exclusions are narrowly drafted and contain broad exceptions . . . [that] provide coverage for the physical damage sustained," *id*. at 9, because the design defect "***resulted in the covered perils*** of building loading and de-bonding of concrete that resulted in structural damage to the reinforcing steel such that the structural elements were so compromised that the building itself was in danger of collapse," *id*. at 10 (emphasis in original).

Plaintiff is wrong.  To be sure, the "But if" exceptions carve out of the exclusions to restore coverage for certain "direct physical loss or damage," under MP Exclusion 3.c.(2), "if an excluded cause of loss . . . *results in* a Covered Cause of Loss," to the extent of "the loss or damage caused by that Covered Cause of Loss," and, under BRP Exclusion 2.c.(1), "if an act, error, or omission ["relating to . . . [d]efects . . . [in] design"] *results in* a covered peril," to the extent of "the loss or damage caused by that covered peril."  The flaw with plaintiff's reasoning is that all of the damage to the Conway Center—the de-bonding of the concrete from the reinforcing steel and the physical damage to the beams and slabs, all of which made the structure incapable of carrying the required loads for the building to be stand and made several floors of the Conway Center unusable— "result[ed] from" the design defect.  In other words, the exceptions to the design defect exclusions are not triggered here because all the damage to the Conway Center stems from the design flaw in the structural members and cannot be attributed to any separate non-excluded (or covered) cause of loss.

Plaintiff's alternative reading of the "But if" exceptions as restoring coverage for physical damage to the Conway Center caused directly and only by the design defect would effectively

nullify the Policies' design defect exclusions—if not all exclusions containing similar exceptions. *See* Defs.' Opp'n at 3, ECF No. 31 (describing plaintiff's interpretation a "nullifying the design defect exclusion" and "yield[ing] an absurd result [that] simply cannot be the law.").  Such a reading contravenes D.C. law by rendering meaningless the exclusions contained in an "all risk" policy.  S*ee District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012) (quotation marks omitted) (explaining that the court "give[s] reasonable effect to all [the contract's] parts and eschew[s] an interpretation that would render part of it meaningless or incompatible with the contract as a whole"); *Dun v. Transamerica Premier Life Ins. Co.*, 858 F. App'x 379, 380 (D.C. Cir. 2021) (explaining that the contract should be read "as a whole" with "meaning that a reasonable person would assign to it" and rejecting interpretation of insurance policy that would render provisions "superfluous").

Disputing that its interpretation would render the design defect exclusions nugatory, plaintiff explains that the exceptions would, for example, still bar coverage for the costs of designing and implementing a solution to reinforce the structural integrity of the Conway Center had the design defect been caught early on during construction.  *See* Pl.'s Opp'n at 21.  Yet, the mere existence of the design flaw on paper is not the type of harm that would even trigger coverage under either policy since coverage requires a "direct physical loss or damage," BRP at 17; MP, ECF No. 26-3 at 62, and a still-theoretical design defect would thus not qualify for coverage. Moreover, when a design defect shows up during the construction process, any physical loss or damage "*caused by or resulting from*" the design defect is expressly excluded.  MP Exclusion 3.c.(2); BRP Exclusion 2.c.(1). Even if that design defect "*results in*" damage, neither exception under the Policies is triggered because design defect damage is, by definition, neither a "Covered Cause of Loss" or "covered peril."

Plaintiff's construction of the exceptions' "results in" language to extend coverage for any damage flowing from the design defect, Pl.'s Mot. at 10, ignores the exceptions' text that ties "results in" specifically to a non-excluded cause of the damage, *i.e.,* "a Covered Cause of Loss" or "a covered peril." *See 3534 E. Cap Venture, LLC v. Westchester Fire Ins. Co.*, No. 19-CV-02946 (APM), 2022 WL 4547505, at *6 (D.D.C. Sept. 29, 2022) (emphasis added) (interpreting a similar design defect exclusion and "But if" exception to mean, taken together, "that the policies *do not provide coverage for the costs to remedy a design defect*, but they do cover any resulting loss from a covered peril"). Insurance policies must be interpreted "as a whole, giving a reasonable . . . and effective meaning to all its terms.," *see Carlyle*, 131 A.3d at 894, and only Hanover's interpretation of the design defect exclusions and their corresponding "But if" exceptions makes sense of the exclusion clauses, the exceptions, and the incorporated definitions of "covered peril" and a "Covered Cause of Loss."

Plaintiff can point to no court—in D.C., Maryland, or elsewhere—that has interpreted an exception, or analogous ensuing loss clause, in an "all risk" policy as broadly as it proposes here. By contrast, Hanover points to several cases from Maryland that read policy provisions identical to the "But if" exceptions here, as well as "ensuing loss" clauses, as covering only losses distinctly segregable from an excluded defective design or workmanship source.

For example, in *Bethany Boardwalk Group LLC v. Everest Security Insurance Company*, *see* 2020 WL 1063060 (D. Md. Mar. 5, 2020) (applying Maryland law), *aff'd per curiam*, No. 20-2319, 2022 WL 12324609 (4th Cir. Oct. 21, 2022), a defectively constructed roof of plaintiff's hotel partially blew off during a wind and rain storm, allowing water to enter the building, resulting in damage to the interior of the building and causing the plaintiff to lose business income during the repairs. 2020 WL 1063060, at *1. The insurance company denied coverage for both the

defective roof and the ensuing water damage to the building under an "all risk" policy, in reliance on two exclusions, one of which excluded loss resulting from faulty workmanship and used language virtually identical to the design defect exclusion in the Master Policy here. *Id.* at *3–5. The exception at issue used the phrase "results in," which the court found functioned similarly to ensuing loss clauses that are "well recognized in Maryland case law." *Id.* at *9–10 (quotation marks omitted). "Although the language of such clauses varies," the court explained that "ensuing losses clauses operate to preserve coverage when a loss excluded under a policy—here, a loss caused by a defect in workmanship—results in a subsequent or 'ensuing' loss that otherwise would be covered." *Id.* Ensuing loss clauses thus "benefit[] both the insurer and the insured: [They] preserve[] the policy's exclusions while at the same time guarantee[ing] coverage for covered losses notwithstanding the occurrence of an excluded peril." *Id.*

The *Bethany Boardwalk* court then surveyed the caselaw on court approaches to interpreting "ensuing loss" clauses. "On the one hand," the court observed, "the 'consensus approach' is that [ ] an ensuing loss clause provides coverage only when there is significant attenuation between the direct result of the workmanship defect and the ultimate loss for which coverage is sought, usually due to an independent or fortuitous intervening cause." *Id.* at *12 (quotation marks omitted) (collecting cases). "In these jurisdictions, courts have uniformly declined to find that an ensuing loss clause covers damage that resulted, in part, due to a defect." *Id.* In contrast, the court explained that "other jurisdictions" took the "broad approach" to reading ensuing loss clauses by "not requir[ing] the covered event to be independent from the excluded peril, but only the direct cause of the loss." *Id.* at *13 (collecting cases). "In these jurisdictions, the analysis is straightforward: If the ensuing loss is also an excluded peril or an excluded loss under the policy, there is no coverage. But, if the policy covers the peril or loss that results from

17

the excluded event, then the ensuing loss clause provided coverage." *Id.* (quotation marks omitted).

With the history and purpose of ensuing loss clauses, and the competing approaches to interpreting them, as frames of reference, the court then addressed the parties' dispute about the scope of the exception, namely: "whether the storm, a 'Covered Cause of Loss,' trigger[ed] the ensuing loss clause in Section B(3), thereby restoring coverage for the Hotel's losses." *Id.*  The court narrowed the parties' dispute to "whether an ensuing loss clause applies to a covered loss that is causally related to an excluded peril, or applies only when the covered loss is the result of an independent or superseding event." *Id.* at *10.  In doing so, the parties effectively asked the Court to predict whether the Maryland Court of Appeals would take the broad or consensus approach to reading the "But if" exception at issue.

Ultimately, the court explained it did not need to "resort to tasseography to predict how the Maryland Court of Appeals would read the ensuing loss clause, because the result [was] the same under either approach[:]" While coverage was excluded for damage to the roof, the ensuing loss clause entitled plaintiff to recovery for the consequential water damages to the hotel. *Id.* at *15–16.  With respect to the roof, the court explained that the roof's defective construction made it unable "to withstand uplift wind pressure," such that disentangling "the damage caused solely by faulty workmanship and that caused solely by the wind" was "conceptually impossible." *Id.* at *15–16; *see also id.* at *15 (emphasis added) ("To be sure, the roof would not have peeled back absent strong winds.  However, it is not disputed that, *but for the defective installation*, the roof should have withstood the wind.").  Observing that "ensuing loss clause[s] only cover[] property wholly separate from the defective property itself," the court explained that to construe the clause to provide coverage for the roof "would transform the ensuing loss clause into a 'grant back'

18

provision and eviscerate the faulty workmanship exception." *Id.* at *16 (quotation marks omitted). At the same time, the court sided with the plaintiff as to the lost business income and consequential water damages to the plaintiff's hotel, finding that the "But if" exception covered those damages because "the faulty roof and storm interacted to cause damage to the Hotel," *id.* at *16, with the storm providing a sufficiently segregable cause from the defective roof to fall within the exception and permit coverage for the interior water damage and lost business income, *see id.* ("[B]ecause a windstorm is a covered cause of loss[,] . . . and the storm that damaged the Hotel occurred subsequent to the faulty installation, the damage caused by the storm, apart from damage to the defective roof, is an ensuing loss[.]").

Just as in *Bethany Boardwalk*, the interpretive debate between the consensus and broad approaches need not be resolved here either because the "But if" exceptions do not provide coverage to the damage to the Conway Center under either approach.  Even interpreting the "But if" exceptions here to allow for coverage of a physical loss that is causally related to, but nonetheless segregable from, an excluded cause of loss—a broader reading of an exception or ensuing loss clause than requiring an entirely independent event—the damage to the Conway Center cannot be conceptually disentangled from the defective design of the structural members, for which the entire purpose was to support the weight of the superimposed loads of the building. Just like the roof in *Bethany Boardwalk* should have withstood the uplifting wind pressures but for the defective workmanship, so too would the structural members have not become irreparably damaged had they been properly designed to handle the weight of the building's dead and live loads.

Seizing on the reading in *Bethany Boardwalk* of the exception as not requiring identification of a wholly independent non-excludable event as the direct cause of loss for coverage

to apply, plaintiff argues that case actually supports coverage under both Policies here.  Pl.'s Mot. at 17–19.  This wishful analysis does not square with the holdings in that case.  In plaintiff's reading of *Bethany Boardwalk*, just like the windstorm interacted with the faulty roof to cause the water damage to the hotel, leading to the court's conclusion that the losses from the water damage were a covered cause of loss, the defective design here resulted in the permanent damage to the steel beams, columns, and slabs.  *Id.* at 19.  *Bethany Boardwalk*, however, held that coverage was excluded for the roof because the defective workmanship "compromised" "the roof's system ability to withstand uplift wind pressure," and the defective workmanship exclusion "removes from coverage losses due to workmanship that is faulty, inadequate, or defective."  2022 WL 12324609, at *15 (quotation marks omitted).  Noting that "ensuing loss clause[s] only cover[] property wholly separate from the defective property itself," *id.* at *16 (quotation marks omitted), and the roof would have withstood the windstorm had it been properly installed, the court explained that the exception did not apply because the damaged roof was accordingly not a "covered cause of loss" under the policy, *see id.* at *15.  In other words, the defective property and the loss for which plaintiff sought coverage were the same—the defective roof—so the "But if" exception, which *only* provided coverage for a "covered cause of loss," could not apply.  *See id.* Similarly, here, the defective property and the loss that plaintiff seeks to cover are the same: The structural members that were supposed to be designed, but failed, to carry the superimposed loads of the Conway Center.  Since the damage to the Conway Center is entirely attributable to the design defect, with no segregable covered cause of loss identified, the loss here, like the damaged roof in *Bethany Boardwalk*, is not a "Covered Cause of Loss" under the Master Policy nor a "covered peril" under the Builders' Risk Policy.  The "But if" exceptions accordingly do not apply.

*Jowite Limited Partnership v. Federal Insurance Company*—another decision from the District of Maryland considering the applicability of an ensuing loss clause to the collapse of a building—supports this result. *See* No. DLB-18-2413, 2020 WL 4748544 (D. Md. Aug. 17, 2020) (applying Maryland law), *aff'd per curiam*, No. 20-1937, 2021 WL 5122173 (4th Cir. Nov. 4, 2021). In *Jowite*, the plaintiff sought insurance coverage for losses sustained when the insured apartment building began to sink into the ground about a decade after construction due to inadequate design and construction of the building's foundation. 2020 WL 4748544, at *4. The insurance policy excluded design defects, with an ensuing loss exception stating that the exclusion did "not apply to ensuing loss or damage caused by or resulting from a peril not otherwise excluded." *Id.* at *3. Likening the loss of the building to the defective roof in *Bethany Boardwalk*, the *Jowite* court denied insurance coverage under the policy's design defect exclusion because the ensuing loss clause covers "only loss 'wholly separate from the defective property.'" *Id.* at *8 (quoting *Bethany Boardwalk*, 2020 WL 1063060 at *8). Given that the plaintiff could not "separate[] from the damages resulting from the defective design and construction of the building" from the sinking and eventual collapse of the building, the *Jowite* court reasoned that the policy's defective design exclusion barred coverage. *Id.* at *8.

Just as the *Jowite* plaintiff could not identify a separate cause than the underlying structural design defect for the damage to its building, plaintiff here cannot explain how the damage to the Conway Center stems from anything other than the critical design flaw to the structural members. Without being able to identify any source for the loss other than the excluded design defect or attribute any part of the loss to another, non-excluded cause, the damages to the Conway Building cannot be a "covered peril" under the Builders' Risk Policy or a "Covered Cause of Loss" under the Master Policy.

Plaintiff attempts to distinguish *Jowite* by arguing that the ensuing loss clause in that case had different language than the "But if" exceptions here and also in *Bethany Boardwalk*, Pl.'s Opp'n at 13–14, but that effort is not persuasive.  To be sure, the ensuing loss clause in *Jowite* provided coverage for "ensuing loss or damages caused by or *resulting from* a peril not otherwise excluded," *Jowite*, 2020 WL 4748544, at *3 (emphasis added), as opposed to the "results in" language here.  Yet, this language difference is irrelevant to the holdings.  As in *Bethany Boardwalk*, *Jowite* rested its holding on the fact that the policy only covered a "peril not otherwise excluded," and the policy expressly excluded any loss "caused by or resulting from any faulty, inadequate or defective . . . [d]esign[.]"  *Id.* at *2–3, *8.  Even if the ensuing loss clause in *Jowite* used the words "results in," coverage would have still been barred under the policy's defective design exclusion because the policy expressly excluded loss "caused by or resulting from" a design defect, so the ensuing loss clause was never triggered.  *See id.* at *8.  Likewise, here, the design defect exclusions clearly bar coverage because the damage to the Conway Center was "caused by or result[ed] from" the defectively designed structural members, so the "But if" exceptions under both policies do not apply.

Plaintiff's only remaining argument is that, because the design defect exclusions and exceptions are ambiguous, deference should be given to plaintiff's interpretation.  Pl.'s Mot. at 21.  As support for this argument, plaintiff points to the different language of "resulting from" versus "results in" used in the exclusions and exceptions, respectively, to argue that its reading of the exclusions, while far narrower than Hanover applied them here due to a broad reading of the exceptions, is at least plausible.  *Id.*  With this ambiguity and plaintiff's self-described reasonable

alternative interpretation, plaintiff maintains that its reading of the exclusions and the exceptions must prevail.  *See id.* (citing *Souza v. Corvick*, 441 F.2d 1013, 1022 (D.C. Cir. 1970)).[5]

This argument does not withstand scrutiny, primarily because the design defect exclusions and exceptions are not ambiguous for all the reasons already discussed.  Even were these provisions of the Policies ambiguous, plaintiff's proffered interpretation is not reasonable and would not be adopted on that basis.  *See Cameron*, 733 A.2d at 968 (D.C. 1999) (quotation marks omitted) (concluding that principle of *contra proferentum*, which holds that "any reasonable doubt which may arise as to the meaning or intent of" an insurance policy provision "will be resolved against the insurer," "does not require courts to indulge in forced constructions to create an obligation against the insurer").

Plaintiff's interpretation is not reasonable because the result would be to nullify the design defect exclusions when the design defect results in direct and cascading physical damage for which no other non-excluded cause is identified.  *See Bethany Boardwalk*, 2020 WL 1063060 at *15-16; *Jowite*, 2020 WL 4748544 at *8.  The only way to make sense of plaintiff's interpretation is to read the excluded loss here to be limited to the structural members' inability to support the superimposed loads of the building, and segregating as excepted the physical damage to the steel beams, columns, and slabs, Pl.'s Reply at 4, even though that physical damage directly results from the design defect.  This is a strained reading that cannot be reconciled with the plain language in the exclusions barring coverage for loss or damage "*caused by or resulting from*" the design defect.  Plaintiff's reading is nothing more than an erasure of the design defect exclusion and,

---

[5]      In *Souza*, the D.C. Circuit considered an ensuing loss clause that case was genuinely susceptible to two different constructions based on the text of the exception clause.  *See* 441 F.2d at 1022 (explaining that, when reading the word "ensue" in the exception next two the two proceeding words, "explosion" and "breakage of glass," ensue must have two entirely different meanings).  By contrast, plaintiff has not demonstrated that the design defect exclusions, even when read in concert with the "But if" exceptions, are genuinely susceptible to two different meanings, so *Souza* is inapposite.

accordingly, "is the epitome of [] a forced construction." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 632 (D.C. Cir. 2010). That plainly cannot be what the parties intended, so plaintiff's interpretation is not reasonable.[6]

## IV.   CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED, and plaintiff's motion for partial summary judgment is DENIED. An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: February 9, 2023

_____

BERYL A. HOWELL
Chief Judge

---

[6] The parties disagree about whether Master Policy Exclusion 2(k), relating to damages caused by settling, cracking, and collapsing, bars coverage, *see* Defs.' Mem. at 23; Pl.'s Opp'n at 22–23, but since the design defect exclusions bar coverage under both the Policies, the issue of whether MP Exclusion 2(k) also prevents coverage need not be addressed.